(Slip Opinion)

# Application of 18 U.S.C. § 209 to Continued Receipt of Standardized Restricted Stock Units Awarded Before Federal Employees Enter Government Service

The vesting of previously-earned restricted stock units during government service does not, as a facial matter, violate 18 U.S.C. § 209.

March 3, 2026

MEMORANDUM OPINION FOR THE SENIOR
COUNSEL TO THE DIRECTOR
OFFICE OF PERSONNEL MANAGEMENT

Congress passed the federal ethics statutes, 18 U.S.C. §§ 201–209, to serve a fundamental principle of republican government: to prevent public officials' misuse of their positions for private gain. The best known of those statutes, section 208, prohibits federal employees from working on matters in which they hold a financial interest. *See* 18 U.S.C. § 208(a). Section 209 reinforces section 208's prohibition by banning federal employees from receiving outside compensation for their government service. *See id.* § 209(a).

As President Kennedy recognized shortly before those laws' passage, "government needs men and women with a broad range of experience, knowledge and ability," including "part-time experts to help deal with problems of increasing complexity and technical difficulty." *Special Message to the Congress on Conflict-of-Interest Legislation and on Problems of Ethics in Government*, Pub. Papers of Pres. John F. Kennedy 326, 327 (Apr. 27, 1961). If ethics laws reached too far, he observed, they could perversely hamstring good government by "creat[ing] wholly unnecessary obstacles to recruiting qualified people for government service." *Id.* at 328. The Supreme Court has described this policy concern as "counsel[ing] against reading [section 209] too broadly." *Crandon v. United States*, 494 U.S. 152, 165, 166–68 (1990).

In order to increase the pool of qualified and talented technologists working on important federal modernization efforts, the Office of Personnel Management ("OPM") proposes to recruit a "Tech Force," which will include employees of leading, private-sector technology companies who will take one- to two-year unpaid leaves of absence from their employers

1

while completing term-limited stints in government.[1] Due to high demand for marketable skills, the standard practice in the competitive technology sector is to award employees restricted stock units ("RSUs") that will vest at regular intervals so long as they remain at the employer—and in some cases even afterward.[2] If such individuals were to join Tech Force, they could face not only a pay cut as a result of switching to a public sector salary, but also the loss of earned but not-yet-vested compensation for work they have already performed in the private sector.

You have asked whether members of Tech Force can keep those earned but not-yet-vested units, or if such units would amount to impermissible supplemental "compensation for [] services as an officer or employee of the executive branch of the United States Government." 18 U.S.C. § 209(a). In performing this analysis, you have asked us to assume that members of Tech Force will be recused from any matter affecting their origin company, ensuring there is no financial conflict of interest under section 208. On February 4, 2026, we orally advised that, as a facial matter, Tech Force members may maintain their RSU vesting schedules. This memorandum explains the basis for that advice and creates a roadmap for how Tech Force affiliates can ensure facial compliance with section 209.

## I.

As your request acknowledges, determining whether any particular distribution to a government employee—whether in the form of RSUs, cash,

---

[1] Memorandum for Lanora C. Pettit, Deputy Assistant Attorney General, Office of Legal Counsel, from Kevin P. Hennecken, Senior Advisor to the Director, OPM, *Re: Tech Force: Application of 18 U.S.C. § 209 to Continued Receipt of Previously Awarded Deferred Compensation Awards* at 1 (Jan. 19, 2026) ("OPM Memo"); *see also* E-mail for Lanora C. Pettit, Deputy Assistant Attorney General, Office of Legal Counsel, from Kevin P. Hennecken, Senior Advisor to the Director, OPM, *Re: Tech Force - 209a Discussion* (Jan. 25, 2026, 7:27 PM) ("OPM E-mail").

[2] *See, e.g.*, Gordon Klepper, *Restricted Stock Units: The Practical Alternative in Equity Compensation for the U.S. Multi-national Employer*, 20 J. COMP. & BENEFITS no. 6, Nov.–Dec. 2004, at 14; *see also In re Lehman Bros. Holdings Inc.*, 855 F.3d 459, 464 (2d Cir. 2017) ("[RSU] arrangements align the employees' financial incentives with those of the company[.]").

or other benefits[3]—is permissible under section 209(a) "would require actual investigation of all surrounding facts and circumstances." Letter for James A. Wilderotter, General Counsel, Energy Research and Development Administration, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel at 7 (May 10, 1976) ("Scalia Letter"); *see also* OPM Memo, *supra* note 1, at 7. Not only is such investigation "not feasible in the context of the ordinary advice-giving function of this office," Scalia Letter at 7, it also would not be particularly useful when advising OPM and partner companies on how to *create* Tech Force, which does not yet exist but is expected to involve employees from numerous different technology companies with potentially distinct leave and compensation policies. *See* OPM Memo, *supra* note 1, at 1.

To provide more concrete guidance about how typical partner companies can structure their programs in compliance with federal law, you have asked us to assume the existence of Company A, a large, publicly traded technology company with a diversified business and customer base. OPM E-mail, *supra* note 1.[4] Company A maintains multiple contracts with agencies of the federal government, including Federal Agency Y. *Id.* In January 2026, an Employee of Company A began a 12-month term of employment at Federal Agency Y, as part of the Tech Force initiative. *Id.* Company A granted the Employee an unpaid leave of absence for that period, but the Employee has not fully separated from

---

[3] For example, certain stock options that vest entirely based on the passage of time would not be materially different from RSUs for purposes of this analysis. The primary difference between an RSU and a stock option is that an employee awarded an RSU that vests on date X receives an actual share of stock on that date—as opposed to the right to purchase a share on date X (or any date thereafter until the option expires) for price Y. In theory, because the value of that option is the spread between price Y and the market price when the option is exercised, a government employee would receive a variable benefit based on the date of purchase. That variation would, however, be irrelevant to the present analysis. Recusal under section 208 would prevent the employee from taking action that would have a direct and predictable effect on the price on the day she intended to buy, and insider trading laws would provide safeguards against improper stock purchases.

[4] For the avoidance of doubt, although we understand that the compensation structure you have described is particularly common in the technology industry, our analysis does not turn on the fact that Company A is a technology company or that the Employee is joining Tech Force. The conclusions we reach could apply also to other hypothetical payors and recipients, so long as they are similarly situated to those we consider here.

Company A and is formally still employed there. *Id.* Company A did not direct or directly influence the Employee to work for Federal Agency Y, *id.*, but Company A has partnered with Tech Force and "nominated" the Employee to participate in the program as a whole. *See* OPM Memo, *supra* note 1, at 1–2.

"[B]ased on speaking with several companies and learning more about their specific policies," you have advised us to assume that in December 2024, prior to any discussions or arrangements regarding the Employee's participation in Tech Force, Company A awarded the Employee a quantity of RSUs. OPM E-mail, *supra* note 1. This was done in keeping with Company A's standard compensation practices, under which the RSUs will vest quarterly, in equal installments, over a three-year period. *Id.*[5] Vesting is conditioned solely on the Employee's continued employment at Company A—*not* Company A's financial performance, the Employee's individual performance, or any government-related outcomes. *Id.* Because the Employee will remain employed at Company A during his stint at Federal Agency Y, and because Company A's vesting schedule does not change based on the Employee's duties, role, or external service, *id.*, the Employee's RSUs will continue to vest during his time in government— just as they would if the Employee were on leave for any other reason. *See* OPM Memo, *supra* note 1, at 1–2; OPM E-mail, *supra* note 1.

---

[5] Executive compensation structures at any large, publicly traded company can be notoriously complex. *See* David F. Larcker, Allan McCall & Brian Tayan, *What Does It Mean for an Executive to "Make" $1 Million?*, World Fin. Rev. (May 27, 2012), https:// worldfinancialreview.com/what-does-it-mean-for-an-executive-to-make-1-million/ [https://perma.cc/58X6-UW7C]; *see also* Simone Hicks, Jonathan Lewis & J. Michael Snypes, Jr., *2025 Executive Compensation Reminders for Public Companies*, Harv. L. Sch. F. on Corp. Governance (Jan. 15, 2025), https://corpgov.law.harvard.edu/2025/01/ 15/2025-executive-compensation-reminders-for-public-companies/ [https://perma.cc/ TT8B-8KGW] (discussing compensation features like incentive plans, "enhanced perquisites," and option awards). You have advised, however, that the target employee for recruitment into Tech Force is young, relatively inexperienced, and likely (on average) to be subject to standardized compensation packages. We thus have not extended our analysis into the more exotic compensation packages awarded to C-suite individuals. We also have not considered any wrinkles that may arise involving RSUs paid to employees of start-ups, which we understand may use the mechanism less as a retention tool than as a way to save up-front compensation costs. Such entities, by their nature, have less well-established policies, making it difficult to provide guidance without specific facts about their circumstances.

Because employer leave policies have been a substantial factor in our prior section 209(a) guidance,[6] you have asked us to consider two different possibilities for Company A, reflecting a policy difference across Tech Force's potential partner companies. *See* OPM E-mail, *supra* note 1.

In scenario 1, Company A has a written, "general leave" policy, permitting paid or unpaid leave for various reasons, including medical leave, parental leave, administrative leave, and personal leave. *Id.* The policy also includes a discretionary provision allowing Company A to approve leave for other reasons not expressly listed. *Id.* In practice, Company A has routinely approved discretionary leaves of varying duration and purpose, including both paid and unpaid arrangements, consistent with Company A's business needs and management approval. *Id.*

In scenario 2, Company A has recently also adopted a formal "civic leave" policy that is specifically intended to support employees who serve in government or other public-service roles. *Id.* To be eligible for civic leave, which by company policy is unpaid, an employee must have worked at Company A for at least two years and maintained a strong performance record there. *Id.* In addition to the continued RSU vesting as described above, an employee on civic leave will continue to receive employer-sponsored health insurance for up to 13 months; COBRA coverage is available thereafter. *Id.* But 401(k) contributions and participation in Company A's employee stock purchase plan are paused during civic leave, to resume upon an employee's return. *Id.* Company A's civic-leave policy aims to support employees across various levels of government and civic organizations; it is not intended to facilitate employees' working for any particular entity or organization. *Id.*

You have represented that, regardless of whether the Employee takes general or civic leave from Company A during his service at Federal

---

[6] *See, e.g.*, Memorandum for Caroline Krass, General Counsel, Department of Defense, from Christopher H. Schroeder, Assistant Attorney General, Office of Legal Counsel, *Re: Application of 18 U.S.C. § 209 to Continued Receipt of Mortgage Benefits* at 4–5 (Dec. 30, 2022) ("Mortgage Benefits Opinion"); Letter for Bruce H. Hasenkamp, Director, President's Commission on White House Fellowships, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel at 5 (Dec. 17, 1976) ("Fellowships Letter"); Letter for John Cho, Assistant General Counsel for Administration, Energy Research and Development Administration, from Leon Ulman, Acting Assistant Attorney General, Office of Legal Counsel at 2–3 (Oct. 7, 1976) ("Exxon Letter").

Agency Y, Company A's continuation of benefits—namely, its continuation of the RSU vesting schedule—will be offered consistent with broader Company A policy and will not be tailored specifically to the Employee. *Id.*

## II.

### A.

As our Office has explained, section 209(a) "bars '(1) an officer or employee of the executive branch or an independent agency of the United States government from (2) receiving salary or any contribution to or supplementation of salary from (3) any source other than the United States (4) as compensation for services as an employee of the United States.'" *Application of 18 U.S.C. § 209 to Employee-Inventors Who Receive Outside Royalty Payments*, 24 Op. O.L.C. 170, 170–71 (2000) ("*Royalty Payments*") (quoting *United States v. Raborn*, 575 F.2d 688, 691–92 (9th Cir. 1978 )).[7] Both the recipient and payor of supplemental compensation that violates section 209(a) are subject to the penalties set forth in 18 U.S.C. § 216, including imprisonment and a fine. *See* 18 U.S.C. § 216.

OPM accepts, and so we will assume, that the deferred vesting of Company A's RSUs during the Employee's service at Federal Agency Y satisfies the first three elements of section 209(a). *See* OPM Memo, *supra* note 1, at 5. "Thus, as has often been the case, the focus" here "is on the fourth element": whether the vesting of Company A RSUs in the Employee "is 'compensation for services as an employee of the United States.'" *Applicability of 18 U.S.C. § 209 to Acceptance by FBI Employees of*

---

[7] There are also several exceptions to section 209(a), *see* 18 U.S.C. §§ 209(b)–(h), including an exception for participation in "a bona fide pension, retirement, group life, health or accident insurance, profit-sharing, stock bonus, or other employee welfare or benefit plan maintained by a former employer." *Id.* § 209(b). Although OPM's memo noted that the receipt of deferred compensation is a "close corollary" to the activities permitted by section 209(b), OPM Memo, *supra* note 1, at 2, we do not understand the question of whether section 209(b) applies to RSU vesting schedules to be squarely presented here. Moreover, it would be difficult to assess without more specific facts. We thus leave the issue for a later time.

*Benefits Under the "Make a Dream Come True" Program*, 21 Op. O.L.C. 204, 205 (1997) ("*FBI Employees*") (quoting *Raborn*, 575 F.2d at 692).

"For payments or benefits from an outside source to constitute 'compensation for services as an employee of the United States,' we have said that there must be 'an intentional, direct link between the outside compensation and the employee's government service.'" Mortgage Benefits Opinion, *supra* note 5, at 3 (quoting *Royalty Payments*, 24 Op. O.L.C. at 171, 173 (some internal quotation marks and citation omitted)); *see also id.* (explaining the textual and historical origin of this standard). Section 209(a) "does not 'prohibit *all* non-government payments to an individual where there is *any* nexus between the payment and the individual's employment by the government.'" *Id.* (emphases added) (some internal quotation marks omitted) (quoting *Royalty Payments*, 24 Op. O.L.C. at 173).

We have identified six, non-exclusive factors that shed light on whether an "intentional, direct link" exists between the compensation and the government service, *id.* (quoting *FBI Employees*, 21 Op. O.L.C. at 206), and we have also instructed that those factors should be evaluated in light of the purpose underlying section 209(a): to "ensur[e] that 'no Government official or employee should serve two masters to the prejudice of his unbiased devotion to the interests of the United States.'" *Id.* (some internal quotation marks omitted) (quoting Memorandum for Fred F. Fielding, Counsel to the President, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: "Stand By Fund"—Applicability of Federal Law to Beneficiaries* at 4 (Feb. 2, 1982) ("Brady Fund Opinion")). The six factors are:

> (1) whether there is a substantial relationship or pattern of dealings between the agency and the payor;
>
> (2) whether the employee is in a position to influence the government on behalf of the payor;
>
> (3) whether the expressed intent of the payor is to compensate for government service;
>
> (4) whether circumstances indicate that the payment was motivated by a desire other than to compensate the employee for her government service . . . ;

(5) whether payments would also be made to non-government employees; and

(6) whether payments would be distributed on a basis unrelated to government service.

*Id.* at 3–4 (alteration in original) (quoting *Royalty Payments*, 24 Op. O.L.C. at 173).

Applying these factors here, we conclude that—as a general matter—it is possible for the RSUs belonging to the Employee to vest in the manner you have described without violating section 209(a). As we have previously explained, stock "granted solely in consideration of past services to the private employer without taking account of the anticipated future status or activity of the employee . . . would present no problem" under the statute. Fellowships Letter, *supra* note 5, at 2. The totality of the circumstances indicates that the deferred RSUs at issue here would be "granted" to Tech Force employees in precisely that permissible manner.

**B.**

If Tech Force stakeholders manage their conduct with respect to factors 1 through 3 in the way we have described in our past section 209(a) guidance, those factors would support the conclusion that deferred vesting of Company A RSUs generally does not constitute compensation for the Employee's service at Federal Agency Y. We often assess factors 1 and 2 in conjunction, and we have previously concluded that, where an employee's ability to influence the government on behalf of the company is limited (factor 2), "unknown[s]" about the relationship between the company and the government carry "little weight" (factor 1). Mortgage Benefits Opinion, *supra* note 5, at 4; *accord Royalty Payments*, 24 Op. O.L.C. at 175. And we have also said that, when an employee "recuse[s] himself for the duration of his [government] service from participating in matters that could affect [his company's] financial interests," the "ability-to-influence factor" is "largely eliminate[d]." Mortgage Benefits Opinion, *supra* note 5, at 4 (quoting *Royalty Payments*, 24 Op. O.L.C. at 175). Factor 3 is likewise not implicated under our precedents if an employer provides adequate assurances that it does not intend to compensate its employees for their time in government service—and an employer will also pass muster simply by making no express statement to the contrary.

*See, e.g.*, *Royalty Payments*, 24 Op. O.L.C. at 173 ("It is unlikely that a payor would expressly indicate an intent 'to compensate for government service.'" (quoting *FBI Employees*, 21 Op. O.L.C. at 206)).

Start with factor 1, "whether there is a substantial relationship or pattern of dealings between the agency and the payor." Mortgage Benefits Opinion, *supra* note 5, at 3 (quoting *Royalty Payments*, 24 Op. O.L.C. at 173). Under your hypothesized set of facts, *see* OPM E-mail, *supra* note 1, Company A has a diversified business and is a contractor of Federal Agency Y. This latter detail could be problematic if Federal Agency Y is relatively small, and its contract with Company A represents a substantial commitment of funds. It could also be problematic if the federal contract represents a large part of Company A's revenue stream. But neither appears likely under your hypothetical. *Cf.* Mortgage Benefits Opinion, *supra* note 5, at 4 (finding that factor 1 was unlikely to indicate an impermissible link between compensation and government service where the payor was one of 3,000 agency contractors and was not one of the 100 largest from that group).[8]

Moreover, even a closer-than-average relationship between Company A and Federal Agency Y could be mitigated by factor 2, because it is also unlikely that the Employee will have the ability to influence Federal Agency Y on behalf of Company A. *See id.* at 4. As you explained the proposal, Tech Force employees "will be GS-14 level and working on discrete technology projects and not in policymaking positions." OPM Memo, *supra* note 1, at 7. Further, as we highlighted at the outset, you also instructed us to "assume . . . that other ethics issues like [18 U.S.C. §] 208 are addressed." OPM E-mail, *supra* note 1. We understand this to be a reference to the requirement in section 208 that government employees recuse from agency actions in which they have a financial interest. *See* 18 U.S.C. § 208(a). As our Office has previously explained, "[e]ven in those circumstances in which [factors 1 and 2] are present, . . . the independent prohibition in 18 U.S.C. § 208 should ensure that . . . payments

---

[8] If Company A does have an unusually strong relationship with a particular agency, it may prove a useful prophylactic not to grant leave for the Employee to work at that agency. But we do not believe such a measure would be legally required so long as the remaining factors track the guidance provided by this Opinion. In particular, the agency would need to establish appropriate recusal policies, as discussed below.

are not made 'as compensation for' the employee[]'s government services." *Royalty Payments*, 24 Op. O.L.C. at 174.

Regarding factor 3, you have assured us that Tech Force's industry partners, including Company A, "will expressly confirm there is no intent to compensate the employee for government services." OPM Memo, *supra* note 1, at 7. Such express confirmations obviate factor 3, and we have placed non-dispositive weight on them in our past section 209 analyses. *See, e.g.*, Mortgage Benefits Opinion, *supra* note 5, at 4; *cf.* Memorandum for Alberto R. Gonzales, Counsel to the President, from M. Edward Whelan III, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of 18 U.S.C. § 209 to Certain Payments* at 5 (Dec. 13, 2002) ("Whelan Memo") ("In your scenario, the former employer has not expressed an intent to compensate for government service (factor 3).").[9]

One potential counterargument arising in the civic-leave scenario is that this express disavowal of intent to compensate employees for government service cannot be reconciled with a company leave policy that is specifically designed "to support employees who serve in government or civic roles." OPM E-mail, *supra* note 1. But again, our past interpretations of factor 3 have focused narrowly on a payor's subjective intent. For instance, in considering Stanford University's grant of an extended leave of absence, we credited Stanford's statement that its policy expressly permitting extended leave for government service (as well as for other outside opportunities) was not intended to compensate faculty for government service but rather "to enable faculty to engage in a higher calling for the public good." Mortgage Benefits Opinion, *supra* note 5, at 4, 8 (citation omitted); *cf.* Brady Fund Opinion at 5–6 & n.5 (relying on "broadened" purpose of rehabilitation fund "originally conceived to provide benefits only to federal employees" injured in assassination attempts). We think the same credit would be due Company A here, provided that it justifies

---

[9] To be clear, we do not think such assurances would be dispositive in the presence of other adverse factors. In particular, indications that such assurances were not reliable would be considered as part of the catch-all inquiry under factor 4. *See infra* Part II.C.3. But our precedent reflects that, of the six factors, factor 3 presents a low bar and is given relatively little weight in our overall analysis. *See Royalty Payments*, 24 Op. O.L.C. at 173 (recognizing that "[i]t is unlikely that a payor would expressly indicate an intent 'to compensate for government service'" (quoting *FBI Employees*, 21 Op. O.L.C. at 206)).

its civic-leave policy (to the extent it has one) in similar terms. There are many legitimate, non-influence-seeking reasons a company might think it productive for its employees to engage in public service, including (among others) reputational benefits, employee skill acquisition, and staff morale.[10]

## C.

Because the first three factors can be managed at the outset, "[t]he focus of our analysis . . . is whether the contextual evidence—reflected in the fourth through sixth factors . . . enumerated [above]—accords with [Company A's] expressed intent." Mortgage Benefits Opinion, *supra* note 5, at 4. We conclude that it does.

## 1.

Taking our existing list somewhat out of order, "[w]e start with the fact that 'payments would also be made to non-government employees' (factor 5)." *Id.* (some internal quotation marks omitted) (quoting *Royalty Payments*, 24 Op. O.L.C. at 173). As we understand the facts you have described, in both the general-leave and civic-leave scenarios, Company A has a general-leave policy expressly permitting leave (and thus the continued vesting of RSUs) for various non-government reasons—medical, parental, administrative, and personal. It also expressly permits leave for "other reasons," and we are told that Company A has "routinely approved discretionary leaves of varying duration and purpose, consistent with [Company A's] business needs and management discretion." OPM E-mail, *supra* note 1. In the civic-leave scenario, Company A has supplemented these leave policies to expressly delineate public service as a permitted use of leave. In either scenario, whether factor 5 weighs in favor of an inference that the leave and continued RSU vesting is another

---

[10] The same justification would suffice if Company A has only a general leave policy: Company A could explain that its intent in granting leave is to enable employees to pursue certain non-work-related goals, including engaging in a higher calling for the public good. The difference between the two scenarios is simply that the question of "expressed intent" becomes more acute where Company A has designed a policy for the *specific* purpose of enabling employees to take leave—and to receive the benefits accompanying that status—during their government service.

form of compensation for government service will depend (at least in part) on whether Company A has ever granted discretionary leave for employment-related pursuits besides government service. *See* Mortgage Benefits Opinion, *supra* note 5, at 4 ("The Stanford Leave Policy on its face permits—and Stanford has, in practice, granted—extensions so that faculty may continue serving in a variety of roles, including teaching high school or assisting start-up companies." (internal quotation marks and citation omitted)).[11] This is a fact not included in your hypothetical, which may vary by company.

The Office of Government Ethics has in the past "questioned" whether it is appropriate to also "take into consideration . . . non-employment related grounds" when determining whether payments are also available to non-government employees under this factor. *Id.* at 5 n.2. We previously declined to resolve that question, but noted that "our Office has sometimes treated non-employment-related comparators as relevant." *Id.* (citing Whelan Memo at 5). But we now conclude that, while significantly less probative than evidence that an employer allows discretionary leave for non-government professional pursuits, non-employment related grounds for leave are not wholly irrelevant to our analysis under section 209(a), because they still shed light on the foremost question: the payor's intent. *See, e.g.*, Brady Fund Opinion at 5 ("In assessing payments made by the Fund, we look primarily to the expressed intent of that Fund.").

Our conclusion that non-employment grounds can only be relevant and not dispositive in the context of factor 5 reflects a common-sense inference: If a company in practice permits leave and its accompanying benefits only on the basis of (1) personal events and (2) government service, that still evinces some preference for government service, because the company has chosen *not* to grant leave for other conceivable reasons, like non-government employment or further education. *Cf. United States v.*

---

[11] Or put another way, a policy that expressly allows leave only to work in the federal government may support (at least in part) an inference that the leave is compensation for government service. A policy that expressly allows for government leave in addition to leave for other employment opportunities, but that is new and has never been used, may help to support a contrary inference. A policy that has actually been used to grant leave for both federal government service and other public interest work will have the same (if not stronger) effect, regardless of whether it expressly lists federal government service as one of the appropriate uses of leave.

*Kirby*, 74 U.S. (7 Wall.) 482, 487 (1869) (explaining that statutes should be read in light of common sense). After all, granting personal leave may in many circumstances be non-negotiable. *See, e.g.*, 29 U.S.C. § 2612(a) (Family Medical Leave Act); Cal. Gov't Code § 12945.2 (2025) (California Family Rights Act).

Still, conferring an equivalent benefit on non-government grounds—regardless of whether they are personal or employment-related—indicates that the company at least does not have the sole intent to use that benefit as compensation for government work. *Cf.*, *e.g.*, Exxon Letter, *supra* note 5, at 2–3, 6 (declining to approve a leave policy that calculated leave pay differently for government and non-government employees). For example, we have found factor 5 "at the least" neutral regarding royalty agreements paid to federal employees absent evidence that a "particular licensee ha[d] entered into licensing agreements *only* with government-employed investors." *Royalty Payments*, 24 Op. O.L.C. at 174 (emphasis added). And we have approved a stock-acceleration agreement granted to a federal employee where the company had made similar agreements with former employees needing "to comply with accounting rules or . . . to divide property in a divorce." Whelan Memo at 5. Even if the company had not offered the same perk for other former employees *working* else-where, such as for a competitor that required divestment, these compara-tors still indicated that the employer's "motive" was likely "to enable former employees to accommodate whatever legal requirements they face." *Id.*

Accordingly, in either scenario 1 or scenario 2, if Company A's leave policy has not previously been used to grant non-government, employ-ment-related leave, we would find that fact relevant to whether the current grant of leave for government employment was a sub rosa way to com-pensate employees for their service. *See* OPM E-mail, *supra* note 1 (indi-cating that the written policy permits discretionary leave "consistent with [Company A's] business needs and management discretion"). But we now conclude it is not dispositive, where Company A provides equivalent benefits for non-government employees and at least does not facially prohibit those benefits to non-government employees pursuing other employment opportunities. *See* Mortgage Benefits Opinion, *supra* note 5, at 5 (emphasizing that the "catchall" in Stanford's leave policy "could apply to employment-related leaves other than high-level government

service"). Under this logic, to answer OPM's specific question about the two scenarios, it would not be "necessary" for Company A to adopt a civic-leave policy, as long as it has "a general leave policy and established leave practices" around non-government professional leave. OPM E-mail, *supra* note 1. The civic-leave policy would become more important in our view, however, if Company A's established leave practices only implicated non-government *personal* leave.

Moreover, under either leave scenario, it would not seem to matter whether Company A "direct[ed] or directly influence[d] the Employee to choose to work for Federal Agency Y." OPM E-mail, *supra* note 1. Section 209(a) is triggered whenever a payor compensates a government employee for federal government service generally, regardless of the recipient's specific government post. *See* Brady Fund Opinion at 4–5.

By contrast, it *would* matter if employees taking civic leave received more or better benefits than employees taking leave for other employment-related reasons. For instance, you have told us that employees on civic leave would receive employer-sponsored health insurance for up to 13 months; you have not specified whether employees potentially taking discretionary leave for other job opportunities would receive that same perk. If they would not, that might be problematic. Health insurance can be expensive,[12] and its availability (or lack thereof) is a common reason people choose what might otherwise be a less desirable position.[13] Although the crux of your question concerns RSU vesting specifically, it is "important" that employees "on leave for government service . . . receive . . . benefits exactly when other similarly situated [employees] do." Mortgage Benefits Opinion, *supra* note 5, at 5. *Any* benefit available to employees receiving leave for government employment (whether via the civic-leave or general-leave policy) that is not available on equal terms to

---

[12] *See, e.g.*, Salpy Kanimian & Vivian Ho, *US Medical Prices and Health Insurance Premiums, 1999–2024*, 8 JAMA Network Open e2547462, at 2 (2025), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2842464 [https://perma.cc/6AQU-FMYK] (finding that "insurance premiums have increased at 3 times the rate of workers' earnings since 1999").

[13] *See, e.g.*, Cong. Budget Off., *Key Issues in Analyzing Major Health Insurance Proposals* 162 (2008), https://www.cbo.gov/publication/41746 [https://perma.cc/X7S3-L3J8] ("The availability of health insurance options can affect people's incentives to enter the labor force, work fewer or more hours, retire, change jobs, or even prefer certain types of firms or jobs.").

employees receiving leave for comparable reasons could raise concerns under section 209(a).

### 2.

This understanding also informs our analysis of factor 6, which asks whether the Employee's deferred compensation is "distributed on a basis unrelated to government service." *Royalty Payments*, 24 Op. O.L.C. at 174 (quoting *FBI Employees*, 21 Op. O.L.C. at 206). So long as Company A grants leave on equal terms to government and non-government employees alike, then the vesting of deferred compensation—which follows directly from an employee's leave status—poses no independent concern. *See* Mortgage Benefits Opinion, *supra* note 5, at 5 ("Just as important, every approved leave or extension carries with it continued mortgage benefits."). That is because each aspect of the vesting events that would happen during the Employee's time at Federal Agency Y was already fixed before the Employee's federal employment began. The amounts, terms, and schedule of those events were all established in December 2024, "as part of Company A's ordinary-course compensation practices." OPM E-mail, *supra* note 1. The RSUs will thus be distributed solely on the basis of conditions established in December 2024; a recipient's government service, or lack thereof, plays no role.

### 3.

Finally, we turn to factor 4, which—notwithstanding its location in our taxonomy—represents something of a catch-all. Specifically, it assesses whether the circumstances here "indicate that [Company A] 'was motivated by a desire other than to compensate the [E]mployee for her government service.'" *Royalty Payments*, 24 Op. O.L.C. at 174 (quoting *FBI Employees*, 21 Op. O.L.C. at 206). In this instance, we think three aspects of the proposed employment structure for Tech Force are potentially relevant: (1) the nature and purpose of RSUs, (2) the potential recruiting "partnership" between Company A and the federal government, and (3) the discretionary component of Company A's general leave policy. Each furthers, or at least does not undermine, our conclusion that Company A's grant of deferred compensation is not intended as compensation for the Employee's work for the federal government.

*First*, we think the overarching structure of RSU vesting plans indicates that Company A's grant of deferred shares is intended to "reward [the Employee's] past service and promote [his] long-term retention"—not to curry favor with the government. OPM E-mail, *supra* note 1. The RSUs were awarded prior to the Employee's government service, as part of Company A's standard compensation protocols, and the only condition attached to the continued vesting of the Employee's RSUs is his continued employment at Company A. The RSUs would thus continue to vest in exactly the same manner if the Employee continued working normally at Company A, or if he took leave for any other reason besides government service. "[T]hese factors point to the conclusion that [Company A] would not be compensating [the Employee] for government service, but instead would be motivated by the economic advantages of securing [the continued employ of] potentially valuable [talent]," including after the Employee returns from leave (of whatever sort). *Royalty Payments*, 24 Op. O.L.C. at 174.

This conclusion is consistent with our treatment of "certain benefits" provided by a "corporate employer[]" to "one of its employees who [wa]s serving as a White House Fellow." Fellowships Letter, *supra* note 5, at 1. In particular, we concluded that the time spent during the fellowship could "[c]ount[] . . . toward the accrual of increased annual vacation" under certain scenarios. *Id.* at 5. We did "not believe that it would ordinarily be appropriate for a company to grant the employee several weeks of paid vacation time (or pay in lieu of vacation) on the theory that this benefit was 'earned' during the Fellowship year." *Id.* That, we said, "would appear to constitute a supplementation of salary under 18 U.S.C. § 209(a)." *Id.* But we did think it would be permissible for the company to "count[] the Fellowship year as a year of service with the company which [could] result in increased vacation time in *future* years." *Id.* (emphasis in original). We emphasized that, "[i]f a White House Fellow takes a leave of absence from his previous position, accrual of seniority for vacation and similar purposes"—insofar as it is "calculated according to an established and reasonable company policy"—"may be viewed as an incident of his being a partner or employee in the private organization (albeit in an inactive status) rather than an incident of Federal service." *Id.* at 5–6.

While admittedly a closer question than the future accrual of vacation time, we think deferred RSU vesting belongs in the permissible camp of

seniority-related benefits that are "incident" to the Employee's status as an employee of Company A. *Id.* at 5. A grant of *new* RSUs during the Employee's time at Federal Agency Y could in some circumstances create an impermissible "'intentional, direct link' between the outside compensation and the [E]mployee's government service." *Royalty Payments*, 24 Op. O.L.C. at 173 (quoting *FBI Employees*, 21 Op. O.L.C. at 206). But here, the Employee will not "earn" new RSUs during his service at Federal Agency Y. Instead, he "earned" them no later than December 2024, and Company A is now "counting" his year of government service as a year of corporate service in which the RSUs can continue to vest. Fellowships Letter at 5. We "cannot see" an impermissible "link based on" Company A's passive decision to let the Employee continue accruing seniority, and with it, *previously* granted RSUs. Mortgage Benefits Opinion, *supra* note 5, at 6–7; *cf.* Letter for Warren G. Magnuson, Chairman, Committee on Commerce, United States Senate, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel at 3 (June 24, 1976) ("The deferred compensation due Mr. Vetter is in the nature of an incentive to early retirement from Texas Instruments. As such, it does not appear to involve risk of violation of [18 U.S.C. § 209]." (citation omitted)).

This reasoning is consistent with prior statements that we have made regarding stock awards made *even during* an employee's federal service. In considering that issue, we concluded that such an award would in theory "present no problem" as long as it was "granted solely in consideration of past services . . . without taking account of the anticipated future status or activity of the employee." Fellowships Letter, *supra* note 5, at 2. That conclusion applies *a fortiori* to the situation here, where the initial award was made before the federal service was in view.

*Second*, we do not think that Company A's potential "partnership" with the Tech Force initiative—up to and including "nominat[ing]" the Employee for participation in the program—would create an impermissible link between federal government service and supplemental compensation paid to the Employee. OPM Memo, *supra* note 1, at 1–2. Although we have addressed similarly situated special government employees *not* receiving government salaries, Letter for Patricia Schroeder, United States House of Representatives, from John R. Bolton, Assistant Attorney General, Office of Legal Counsel at 1–2 (Mar. 12, 1986) (opining on "Executive Exchange Program" in which companies would nominate and pay

employees for one-year terms as otherwise unpaid special government employees, under 18 U.S.C. § 209(c)), to our knowledge, we have not previously opined on a scenario where a payor directly facilitated an employee's paid work for the federal government in this way. But novelty does not necessarily equate to illegality. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012) (opinion of Roberts, C.J.) ("Legislative novelty is not necessarily fatal; there is a first time for everything.").

In assessing the legality of such a partnership, it may matter how much discretion Company A has in making the award of RSUs and when that discretion is exercised—particularly in conjunction with any role Company A plays in a nomination process. "Our Office has . . . traditionally been cautious about giving 'advisory approval to payments to present or prospective Federal employees if the payor has discretion to determine whether the payment should be made.'" Mortgage Benefits Opinion, *supra* note 5, at 6 (quoting Fellowships Letter, *supra* note 5, at 3). As we have explained, timing also matters because "the exercise of that discretion at a time when the payor is aware of the recipient's status as a Federal employee suggests the possibility of a sufficient connection between the status and the payment that the one may be 'compensation for' the other." Fellowships Letter, *supra* note 5, at 3. "Based on those concerns, this Office has declined to approve as consistent with section 209(a) discretionary grants of stock options or separation payments from former employers." Mortgage Benefits Opinion, *supra* note 5, at 6 (collecting past guidance).

Here, our understanding is that Company A, as an ordinary course compensation practice, awards RSUs for particular types of positions and performance levels, at regularly scheduled intervals. Where there is temporal separation between the award and nomination, and relatively little discretion or variance from ordinary course compensation practices underpinning the award to begin with, we do not think it reasonable to infer that Company A awarded the RSUs because the Employee had agreed to participate in Tech Force. But the greater the company's discretion and the closer in time it is exercised to the Employee's nomination, the closer the question. We cannot say how we would treat a situation, for instance, in which Company A granted a purely discretionary award of RSUs shortly after nominating the Employee for Tech Force. Nomination closely preceded by a discretionary stock grant would sound in the same regis-

ter, because Company A presumably was "aware of" its intended nominee at some time prior to the formal event. *See* Fellowships Letter, *supra* note 5, at 3.

In the light of these potential concerns stemming from the interaction between the nomination component of the program and any potential discretionary stock grants, we would advise that you instruct Tech Force's partner companies to ensure that nominations or related decision making occur only after any discretionary RSUs are granted. With that guardrail in place, we would not attribute any separate significance to the fact that a company has a stated "partnership" with Tech Force. We do not see a section 209(a) flaw in a world where a company (1) openly approves the Tech Force initiative by "partnering" with it, (2) compensates its employees in the ordinary course, and also (3) permits employees, through their independent choice, to take leave to participate in Tech Force.

*Third*, by some contrast, we do not believe that the discretionary component of Company A's leave policy—whether general or civic—would raise any inference of intent to compensate for government service.

Importantly, our Office's Mortgage Benefits Opinion recently distinguished between discretionary approval of *payments* and discretionary approval of *leave* from which certain payments indirectly follow. *See* Mortgage Benefits Opinion, *supra* note 5, at 6–8. We concluded that the latter situation, unlike the former, does not reflect an "'intentional, direct link' between the outside compensation and the employee's government service," *Royalty Payments*, 24 Op. O.L.C. at 173 (quoting *FBI Employees*, 21 Op. O.L.C. at 206), because the employer's "only discretionary decision . . . does not standing alone provide anything that could be construed as 'compensation for [government] services as an officer or employee of the executive branch.'" Mortgage Benefits Opinion, *supra* note 5, at 6 (alteration in original) (quoting 18 U.S.C. § 209(a)). We therefore approved Stanford's decision to grant a government employee discretionary leave and the continued discounted mortgage (a "mortgage benefit") automatically accompanying that leave status. *See id.* at 6–8.

That logic leads us to the same conclusion here. Even assuming Company A exercises discretion in granting leave—which we understand "it may do . . . for reasons unrelated to government service"—it does not exercise any discretion as to the continued vesting of RSUs. *Id.* at 6. Instead, the RSUs vest incrementally according to the predetermined

19

agreement between Company A and the Employee as long as the Employee is either working at or on leave from Company A—or, in the case of other companies, after an employee has separated from the company. Nothing about Company A's discretionary leave decision could bleed into and make discretionary those pre-scheduled vesting events. "In particular, we struggle to imagine a plausible scenario in which [Company A] would approve [leave] *in order to* [permit the vesting events] that follow, as would be necessary to establish a violation of section 209(a)." *Id.* at 7 (emphasis in original).

One counterargument is that under our Mortgage Benefits Opinion, the nature of the accompanying non-discretionary benefit matters because it determines how directly or indirectly that benefit flows from the discretionary leave decision. *See id.* Any such argument would, however, overread the distinction we were drawing between the award of "discretionary stock options and severance payments," and the decision not to rescind a mortgage benefit. *Id.* Money is fungible, and benefits that can be readily converted to cash only slightly less so. As a result, the question before us then was not truly the form of the benefit but whether it evidenced an "unproblematic" aim. In that case, Stanford's aim was "allow[ing] faculty to take leave and return to the university by enabling them to avoid disruption to long-term commitments that cannot easily be unwound during temporary leaves." *Id.* Here, Company A's aim is very similar: to permit brief periods of service for the public good without disrupting the "long-term" commitments represented by the RSUs, which were earned for prior work and would be lost if they did not continue to vest during the Employee's approved leave. The "totality of the circumstances" indicate that Company A would be pursuing that permissible aim, and not intentionally compensating for government service, by allowing the Employee's RSUs to continue vesting as previously scheduled during the Employee's participation in Tech Force. Brady Fund Opinion at 5.

### III.

In conclusion, the deferred vesting of restricted stock units in a Tech Force employee generally would not violate 18 U.S.C. § 209(a). In reaching that determination, we have made various assumptions and uttered

some words of caution; we refer the reader to the body of the opinion for those details.

Please let us know if you have any additional questions.

LANORA C. PETTIT
*Deputy Assistant Attorney General*
*Office of Legal Counsel*